[Cite as *State v. Cisse*, 2013-Ohio-3895.]

COURT OF APPEALS
DELAWARE COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | |
| | : | Hon. W. Scott Gwin, P.J. |
| Plaintiff-Appellee | : | Hon. Patricia A. Delaney, J. |
| | : | Hon. Craig R. Baldwin, J. |
| -vs- | : | |
| | : | Case No. 12 CAA 10 0074 |
| | : | |
| JAGA N. CISSE | : | |
| | : | |
| | : | |
| Defendant-Appellant | : | O P I N I O N |

CHARACTER OF PROCEEDING:      Appeal from the Delaware County Court
                              of Common Pleas, case no. 12 CR I 06
                              0210 B

JUDGMENT:                     AFFIRMED

DATE OF JUDGMENT ENTRY:       September 6, 2013

APPEARANCES:

For Plaintiff-Appellee:                For Defendant-Appellant:

CAROL HAMILTON O'BRIEN                 DAVID H. BIRCH
DELAWARE CO. PROSECUTOR                286 South Liberty St.
BRIAN J. WALTER                        Powell, OH 40365
140 North Sandusky St.
Delaware, OH 43015

*Delaney, J.*

{¶1}   Appellant Jaga N. Cisse hereby appeals from the September 20, 2012 Judgment Entry of conviction and sentence of the Delaware County Court of Common Pleas.   Appellee is the state of Ohio.   This case is related to *State of Ohio v. Dame Cisse*, 5th Dist. Delaware No. 12 CAA 09 0070.

## FACTS AND PROCEDURAL HISTORY

{¶2}   Appellants Dame and Jaga Cisse are brothers from Senegal who are naturalized U.S. citizens.   Jaga's first name was originally "Ndiaga," but when he became a citizen, he changed it to "Jaga" because the latter is easier for Americans to pronounce.   For the time period relevant to this case, Dame and Jaga lived together at 1776 Bairsford Drive, Columbus, Ohio.   Both brothers were employed, sometimes working multiple jobs, and enrolled in college courses.   According to Dame, they rarely saw each other despite living in the same house.   Mail for both brothers came to the house.

### The JPMC Hiring Process

{¶3}   J.P. Morgan Chase (JPMC) operates a major enterprise in central Ohio with offices throughout the region and thousands of employees engaged in myriad activities involving banking, loans, and mortgages.

{¶4}   JPMC has an online application process by which applicants submit an initial application online for a recruiter to review.   If the applicant meets the initial criteria for a position, the recruiter schedules an interview between the applicant and a JPMC manager.   The interview takes place at the office location where the manager is based.

{¶5} If the applicant's interview is successful, the recruiter contacts the applicant again to schedule a background check which includes fingerprinting, photographing, and a drug test. This background check occurs at yet a different location. At the time of these events, all fingerprinting and photographing for background checks for employment with JPMC in the Columbus area was performed at 1111 Polaris Parkway, Columbus, Ohio. This location is in Delaware County.

{¶6} Finally, if the background check is successful, an offer of employment may be extended. If something undesirable shows up in the background check, no offer of employment is made and any offers already discussed are rescinded.

{¶7} At trial, a JPMC investigator acknowledged the inherent flaw in this hiring process: the interviewer is not present at the background check location, nor is the recruiter present at the interview. The possibility exists, therefore, that the person interviewed is not the person who shows up to be fingerprinted, photographed, and subsequently background-checked.

*Dame Cisse is Rejected for a Position at JPMC and "Ndiaga" is Hired*

{¶8} On or around November 9, 2009, Dame Cisse submitted an online application to JPMC for the position of Executive Resolution Analyst. This application was rejected.

{¶9} On January 12, 2010, "Ndiaga Cisse" submitted an online application to JPMC which was duly reviewed by a recruiter. "Ndiaga's" application was forwarded to Robert Hall, the manager of a group called the Customer Request Management Team.

{¶10} Hall met with "Ndiaga Cisse" in person for an interview at the JPMC facility at 3415 Vision Drive, Columbus, known as the "Easton" facility and located in Franklin

County. "Ndiaga" told Hall to call him "Jack." "Jack" was working on a bachelor's degree in accounting and hoped that the temporary position might lead to a permanent position with JPMC. "Jack" was very friendly and outgoing and Hall recommended him to be hired. After the interview, Hall told the recruiter to contact "Jack" regarding the background check process.

{¶11} The background check seemingly went smoothly because a few weeks later, in late January or early February, 2010, "Jack" became one of Hall's new team members. On his first day at JPMC, Hall met "Jack" and five or six other new hires in the lobby at the Easton facility, escorted him to his new desk, and helped him start in his new position.

{¶12} About a week later, "Jack's" JPMC ID badge arrived and Hall delivered it to him. The badge is used to enter and exit the JPMC offices but employees usually do not wear the badges throughout the workday. The badges display a photo of the employee and their name.

{¶13} "Jack" worked on Hall's team through May 2010; Hall described him as a productive employee with an average work product, but very personable, friendly, and always smiling. At the close of the busy season, Hall encouraged his team, including "Jack," to apply elsewhere for permanent positions with JPMC.

{¶14} Carly Richardson worked as an "Investor Reporting Mortgage" for JPMC; the team she supervised reported Freddie Mac loans for mortgages. Richardson also worked at the Easton location. Someone on her team referred his friend "Jaga" to her as a potential new team member and Richardson interviewed him. "Jaga" had accounting and mortgage experience on his resume and would not require another

background check because he was already employed by JPMC. Richardson brought him onto her team as a temporary employee with the title "Investor Reporter, Operations Analyst."

*Supervisor Discovers Discrepancy on "Jaga's" ID Badge*

{¶15} Richardson always referred to "Jaga" as "Jaga" but she heard other employees call him "Jack." She testified she was not impressed with his performance as an employee and his slowness affected the competitiveness of her unit; consequently, she visited "Jaga's" cubicle frequently to make sure he stayed on task. One day Richardson came into his cubicle and noticed "Jaga's" JPMC ID badge lying in plain sight; she was surprised to notice the photo was not of the man she knew as "Jaga." She said, "That's not you," and "Jaga" replied, "Yes it is; I lost weight." "Jaga" tried to snatch the badge from Richardson.

{¶16} Richardson left "Jaga's" cubicle and reported the matter to her immediate supervisor, who had access to the JPMC employee Passport system containing employee photos. Together they pulled up the photo of "Jaga," and it was not the man working for Richardson as "Jaga Cisse." Richardson looked on Facebook and discovered that the man she knew as "Jaga" was in fact appellant Dame Cisse, and that appellant Jaga (Ndiaga) Cisse was Dame's brother. At trial, Richardson identified Dame as the man who worked for her under the name "Jaga," and Jaga as the man pictured in the JPMC employee ID badge used by Dame.

*The JPMC Investigation*

{¶17} Richardson reported the matter to corporate security and Kelly O'Reilly launched an investigation. O'Reilly was aware of Richardson's Facebook research and

discovered through a LexisNexis search that Dame and Jaga lived at the same address. Additional research tied the brothers together more closely. He found a blog written by "Ndiaga Cisse" containing a photo that matched the photo on the JPMC employee ID badge. He reviewed forensic imaging of "Jaga's" JPMC computer that revealed emails from the address papadame2000@gmail.com. One email contained an attachment of a letter written by Dame Cisse to FINRA, a financial industries regulatory agency that oversees brokers.

{¶18} O'Reilly also discovered JPMC paychecks payable to "Ndiaga Cisse," endorsed by Ndiaga Cisse over to Dame Cisse.

{¶19} O'Reilly's next step was to interview Dame and Jaga Cisse. He met with the JPMC employee known as "Jaga" on September 7, 2010 at the Easton facility. "Jaga" stated his date of birth was March 4, 1977 and the last four digits of his Social Security Number were 8575, consistent with the "real" Jaga Cisse. O'Reilly asked him to explain the discrepancy in the photo on his employee ID badge. "Jaga" said there was a delay in receiving his badge, and when he finally got it the photo was wrong, but he never got around to asking for a new one. When his supervisor had confronted him about the photo, "he was just joking" when he told her it was him but he lost weight. "Jaga" said he didn't have the badge on him during the interview, and also stated he didn't have any form of government ID on him, either; "Jaga" said he would get these items and bring them back to the HR department that day. "Jaga" also stated he would be willing to come back at a later date to be fingerprinted.

{¶20} O'Reilly confronted "Jaga" with a picture of Dame Cisse printed out from Facebook, and "Jaga" denied it was him, claiming Papa Dame Cisse is his cousin from

Florida.  "Jaga" declined to make a written statement and was suspended pending the investigation.

{¶21} That evening, after O'Reilly was gone for the day, someone came into the HR office and provided a driver's license for Jaga Cisse, date of birth March 4, 1977. The photo on the license matches the photo on the JPMC employee ID badge, but does not match the individual working at JPMC as "Jaga Cisse."  The person also brought in the JPMC employee ID badge and the photo on the badge had been noticeably scratched.

{¶22} O'Reilly discovered an earlier JPMC application by Dame Cisse in the company's files dated November 9, 2009.  A photograph of Dame Cisse had been taken as part of the background check into that application: the person currently working for JPMC as "Jaga Cisse" was in fact Dame Cisse.

{¶23} Finally, O'Reilly discovered a temporary employee by the name "Jaga Cisse" had been hired with JPMC in May or June, 2011, and this "Jaga Cisse" was a different individual than the "Jaga Cisse" interviewed by O'Reilly.  This individual was still in training and had been hired through a temporary agency.  He was able to work for a while for JPMC before being "red flagged" by corporate security.

{¶24} O'Reilly concluded Jaga and Dame worked together to evade the background check for Dame because Jaga had obviously reported to the 1111 Polaris Parkway location and undergone the background check, established by his photograph on the employee ID badge and his fingerprints on file.

{¶25} O'Reilly got in touch with the supervisor who was training the "real Jaga" and asked him to make Jaga available for an interview.  Jaga left the training room to take a phone call and never returned.  Consequently O'Reilly never met Jaga in person.

*The Columbus Police Department Investigation*

{¶26} O'Reilly turned the results of his investigation over to the Columbus Police Department.  Detective Todd Schiff spoke to Jaga Cisse by telephone.  Jaga confirmed Dame was his brother but stated he had no means of reaching him.  Schiff eventually reached Dame Cisse by telephone; Dame denied working at JPMC during the dates in question and said he last worked there as a temp in 2003.

{¶27} Schiff prepared a photo lineup which was shown to Carly Richardson; she selected Dame as the person who worked for her as "Jaga" and Jaga as the person pictured on the JPMC employee ID badge.

{¶28} Schiff obtained records of a Huntington Bank account held by Dame; Dame had listed his current employer as JPMC.

*First Indictment and Jury Trial: Mistrial*

{¶29} Dame Cisse and Jaga Cisse were originally indicted together on August 26, 2011; Dame was charged with two counts of identity fraud pursuant to R.C. 2913.49(E), both felonies of the fifth degree, and Jaga was charged with one count of identity fraud pursuant to R.C. 2913.49(D), a felony of the fifth degree.

{¶30} The case proceeded to joint jury trial.  During appellee's case in chief, Schiff, testifying in narrative fashion and not in response to a specific question, commented several times that appellants refused to speak to him without counsel present.  During cross-examination, Dame's trial counsel, in the context of the general

willingness of witnesses and suspects to speak with law enforcement, asked, "And in your experience, is an illegal alien open and eager to talk with you?" Appellee objected and the trial court recessed for the day.

{¶31} Outside the presence of the jury, the trial court found pursuant to *State v. Leach*, appellee allowed Schiff to raise an inference of guilt prejudicial to appellants by referencing their pre-arrest silence. 102 Ohio St.3d 135, 2004-Ohio-2147, 807 N.E.2d 335. Appellee objected to the trial court's characterization of the prosecutor's questions, but the trial court prompted appellants' trial counsel for motions, and appellants both moved for mistrial. The motions were granted and the trial court observed, "Certainly there was no intention here on the part of [appellee] to create a mistrial * * *. It's obvious that there is substantial evidence that's been presented here. And this was after two days of trial something that was maybe brought out and certainly not intended for that inference by [appellee] and probably not even by the detective, he wasn't really conscious of what he was saying regarding that issue."

*Re-Indictment and Trial*

{¶32} On June 1, 2012, appellants were charged again by indictment. The following information is taken from the joint indictment of Dame and Jaga, and appellee's bill of particulars. Each offense charged is a felony of the fifth degree.

| Ct. | DEFT. | OFFENSE | DATE(S) | CONDUCT ALLEGED | VERDICT |
|---|---|---|---|---|---|
| I. | Dame | R.C. 2913.49(E) Identity Fraud | 12/23/09- 1/12/10 | Pretended to be Jaga while applying for job with JPMC | Not Guilty |
| II. | Jaga | R.C. 2913.49(D) Identity Fraud | 12/23/09- 1/12/10 | Allowed Dame to use his ID info in applying for position w/JPMC | Not Guilty |
| III. | Dame | R.C. 2913.49(D) Identity Fraud | 1/13/10- 1/20/10 | Pretended to be Jaga during interview with Robert Hall | Not Guilty |

| IV. | Jaga | R.C. 2913.49(D) Identity Fraud | 1/13/10-1/20/10 | Allowed Dame to use his ID info during interview w/Hall | Not Guilty |
| V. | Jaga | R.C. 2913.49(D) Identity Fraud | 1/21/10 | Permitted Dame to use his ID info during background check | (No Verdict) |
| VI. | Dame | R.C. 2913.49(E) Identity Fraud | 1/21/10 | Held himself out as Jaga for purposes of background check | (No Verdict) |
| VII. | Dame | R.C. 2923.03(A)(2)/ R.C. 2913.49(D) Aid & Abet Identity Fraud | 1/21/10 | Encouraged Jaga to allow him to use his ID info for purposes of background check | (No Verdict) |
| VIII. | Dame | R.C. 2913.49(E) Identity Fraud | 2/1/10-9/6/10 | Posed as Jaga while working for JPMC | Guilty |
| IX. | Jaga | R.C. 2913.49(D) Identity Fraud | 2/1/10-9/6/10 | Allowed Dame to pose as Jaga while working for JPMC | Guilty |
| X. | Dame | R.C. 2913.49(E) Identity Fraud | 9/7/10 | Pretended to be Jaga during interview with JPMC corporate security (O'Reilly) | Guilty |
| XI. | Jaga | R.C. 2913.49(D) Identity Fraud | 9/7/10 | Permitted Dame to use his ID info during interview with JPMC corporate security (O'Reilly) | Guilty |

*Testimony of Dame and Jaga: Dame Makes Admissions but Both Claim Jaga Didn't Know About Identity Theft*

{¶33} Dame and Jaga testified at the second trial. Dame admitted to using Jaga's identity to gain employment with JPMC. Dame testified that he was offered a job at JPMC which was later withdrawn; he applied again under the name "Ndiaga Cisse," using his brother's information. He did not tell Jaga he was doing this or ask his permission. Dame was unaware Jaga had changed his name when he became a citizen, from Ndiaga, hence the discrepancy. Dame submitted the online application using Jaga's name, date of birth, Social Security number, and pertinent information.

When JPMC called to schedule an interview, Dame attended the interview with Robert Hall. He knew the next part of the process would be the background check. Dame testified he told Jaga someone from JPMC called and said he should come in for a background check; Dame encouraged him to go because maybe it would turn into a job. He still did not tell Jaga he had applied for a job in his name.

{¶34} Dame received a call from JPMC confirming his start date and began working. He worked for Robert Hall for three months and then applied for another position within JPMC. During his employment, he never told Jaga he was working under his name. When Carly Richardson confronted him about the ID badge photo that was not him, Dame admitted he claimed he lost weight, and said he told Kelly O'Reilly that he knew it was a mistake but never bothered to correct it. When he was suspended after the interview, he took Jaga's driver's license and some identifying information while Jaga was in the shower and brought it into the HR department and dropped it off. He did not have Jaga's permission to use the documents.

{¶35} Dame insisted Jaga knew nothing about the identity fraud scheme. Dame claimed that he signed the paychecks over to himself trying to make two signatures look different.

{¶36} Jaga in turn testified that he never knew Dame used his information to apply for a job at and work for JPMC. When he got a call to come in for a background check, he thought it was "weird," but his resume information was on the Ohio State University career services' website and he thought perhaps JPMC contacted him in connection with that. He thought he had nothing to lose by going in for the background check even though at that point he had never applied for any position with JPMC.

{¶37} The same day he was photographed and fingerprinted, he received an offer letter in the mail from JPMC offering him a job. Jaga testified he thought about taking it, but he was already going to school and working a different job, and it would be too many hours. He claimed he called "a woman" at JPMC and turned the job down. Jaga speculated at trial his brother set up a series of phone calls to make the possible job scenario more believable so it was more likely Jaga would go in for the background check. Jaga testified he never saw any paychecks in his name from JPMC, and he never gave Dame permission to use his driver's license or any other information. He also testified the evidence regarding the JPMC hiring process is not accurate because he was hired there in June 2011 without interviewing with any JPMC manager.

{¶38} Appellant moved for judgments of acquittal at the close of appellee's evidence and at the close of all the evidence, and the motions were overruled. Appellants were found not guilty of some counts, guilty of others, and the jury was unable to reach a verdict on others, as shown on the chart, supra. After the jury was unable to reach a verdict as to Counts V., VI., and VII., appellee dismissed those counts.

{¶39} Appellants were each sentenced to a term of community control, three years for Dame and two years for Jaga. Appellants now appeal from the judgment entries of their convictions and sentences.

{¶40} Appellant Jaga Cisse raises four assignments of error:

**ASSIGNMENTS OF ERROR**

{¶41} "I. THE TRIAL COURT ERRED BY NOT FINDING THAT JEOPARDY ATTACHED TO THE APPELLANT WHEN A MISTRIAL WAS GRANTED."

{¶42} "II.  THE TRIAL COURT ERRED BY NOT FINDING THE APPELLEE'S EXHIBITS HEARSAY AND PRECLUDING THEM."

{¶43} "III.  THE TRIAL COURT ERRED BY OVERRULING APPELLANT'S MOTION FOR ACQUITTAL MADE AT THE CLOSE OF ALL EVIDENCE."

{¶44} "IV.  THE CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

**ANALYSIS**

I.

{¶45} In his first assignment of error, appellant argues the trial court erred in not finding jeopardy attached after granting a mistrial.  We disagree.  This argument is similar to that raised by appellant's co-defendant and we adopt the same rationale.

{¶46} In *Oregon v. Kennedy*, 456 U.S. 667, 679, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982), the Supreme Court held: " ' * * * [T]he circumstances under which such a defendant may invoke the bar of double jeopardy in a second effort to try him are limited to those cases in which the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial." Prosecutorial misconduct will bar a second trial only when such behavior was 'intentionally' calculated to cause or invite mistrial. *State v. Doherty*, 20 Ohio App.3d 275, 276, 485 N.E.2d 783 (1st Dist.1984). Accordingly, not all retrials after jeopardy attaches are precluded. See *State v. Glover*, 35 Ohio St.3d 18, 19, 517 N.E.2d 900 (1988). Rather, if a mistrial was properly granted, then retrial is constitutionally permissible. Id., 19-20.

{¶47} The reviewing court examines the trial court's decision to grant a mistrial with deference. *Glover*, supra, 35 Ohio St.3d at 19. A balancing test is employed

whereby appellant's right to be tried by the original tribunal is weighed against the public's interest in the efficient implementation of justice. Id. At times, the public's interest in a fair trial dominates over appellant's right to have his fate determined by a certain tribunal. Id. Thus, "[w]here the facts of the case do not reflect unfairness to the accused, the public interest in insuring that justice is served may take precedence." Id. In evaluating the propriety of a mistrial order, the reviewing court should apply flexible standards "due to the infinite variety of circumstances in which a mistrial may arise." Id. at 19, citing *United States v. Jorn*, 400 U.S. 470, 480, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971).

{¶48} In this case, it was prejudicial comments of appellee's witness, unprompted by appellee, which resulted in the trial court properly sustaining the defendants' joint motion for mistrial. It is apparent from the record that neither appellee nor the trial court "goaded" trial counsel into asking for a mistrial. We find the judge's action in declaring a mistrial was not instigated by prosecutorial misconduct designed to provoke a mistrial, nor was the declaration of a mistrial an abuse of discretion.

{¶49} Accordingly, appellant's protection against double jeopardy has not been violated and his first assignment of error is overruled.

II.

{¶50} In his second assignment of error, appellant argues the trial court should have excluded the copies of Facebook pages taken from the web offered as exhibits by appellee. We disagree.

{¶51} The admission or exclusion of evidence is a matter left to the sound discretion of the trial court. Absent an abuse of discretion resulting in material prejudice

to the defendant, a reviewing court should be reluctant to interfere with a trial court's decision in this regard. *State v. Hymore*, 9 Ohio St.2d 122, 128, 224 N.E.2d 126 (1967).

{¶52} First we note the exhibits at issue here are distinguishable from those in the case cited by appellant, *State v. Tooley*, 11th Dist. Portage No. 2004-P-0064, 2005-Ohio-6709, reversed on other grounds, 114 Ohio St.3d 366, 2007-Ohio-3698, 872 N.E.2d 894, cert. denied by *Tooley v. Ohio*, 552 U.S. 1115, 128 S.Ct. 912, 169 L.Ed.2d 757 (2008). *Tooley* was a child pornography case in which a law enforcement witness testified about the ages and countries of origin of victims in computer images. The "layers of hearsay" in that case referred to the many layers of investigation which had involved the Department of Homeland Security and international law enforcement in identifying victims in images generated by a worldwide web of child exploiters.

{¶53} In this case, as the trial court determined, the jury was free to look at the photos from the Facebook pages and determine their weight. The Facebook photos were only relevant to the investigation and how first Richardson and then investigators determined who "Jaga Cisse" really was. In light of Dame's subsequent admissions, the admission of this evidence was harmless.

{¶54} Appellant's second assignment of error is overruled.

### III., IV.

{¶55} Appellant's third and fourth assignments of error challenge the manifest weight and sufficiency of the evidence and will be considered together. Appellant argues appellee presented insufficient evidence of venue and the jury lost its way in finding appellant knew of and participated in Dame's plan of identity theft. We disagree.

{¶56} Appellant was found guilty of two counts of identity theft pursuant to R.C. 2913.49(D), which states, "No person, with intent to defraud, shall permit another person to use the person's own personal identifying information."

{¶57} The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different. *State v. Thompkins*, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541, paragraph two of the syllabus. The standard of review for a challenge to the sufficiency of the evidence is set forth in *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991) at paragraph two of the syllabus, in which the Ohio Supreme Court held, "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."

{¶58} In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as the "thirteenth juror," and after "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be overturned and a new trial ordered." *State v. Thompkins*, supra, 78 Ohio St.3d at 387. Reversing a conviction as being against the manifest weight of the

evidence and ordering a new trial should be reserved for only the "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶59} Appellant challenges the sufficiency of appellee's evidence with respect to the element of venue. It is axiomatic that "[v]enue, although not a material element of the offense, must be proven by the state unless it is waived by the defendant." *State v. Headley*, 6 Ohio St.3d 475, 453 N.E.2d 716 (1983); *State v. Draggo*, 65 Ohio St.2d 88, 418 N.E.2d 1343 (1981). The issue of venue was raised several times through the course of two trials; all parties have acknowledged the sole event which occurred in Delaware County is the background check, to wit, Jaga Cisse reported to the JPMC location at 1111 Polaris Parkway to be fingerprinted and photographed. The drug test occurred elsewhere. The interview and work performed by Dame Cisse occurred at the Easton location in Franklin County. Nevertheless, venue for all of the offenses is proper in Delaware County, as it would have been in any county where any element of the offense of identity theft occurred.

{¶60} R.C. 2901.12(A) governs venue in criminal cases and states that the trial should be "held in a court having jurisdiction of the subject matter, and in the territory of which the offense or any element thereof was committed." Therefore, venue can exist in any jurisdiction where any element of the crime was committed. *State v. Plants*, 5th Dist. Tuscarawas No. 2009 AP 10 0054, 2010-Ohio-2930, ¶ 39, citing *State v. Chakirelis,* 11th Dist. Lake No. 95-L-041, 1996 WL 200605 (March 29, 1996). The standard of proof is beyond a reasonable doubt, although venue need not be proved in express terms so long as it is established by all the facts and circumstances in the case. *State v. Dickerson*, 77 Ohio St. 34, 82 N.E. 969 (1907), paragraph one of the syllabus.

{¶61} All eleven counts of the indictment assert the offenses occurred in Delaware County; appellee's bill of particulars states each offense occurred as part of a continuing course of conduct.  R.C. 2901.12(H) states:

> When an offender, as part of a course of criminal conduct, commits offenses in different jurisdictions, the offender may be tried for all of those offenses in any jurisdiction in which one of those offenses or any element of one of those offenses occurred. Without limitation on the evidence that may be used to establish the course of criminal conduct, any of the following is prima-facie evidence of a course of criminal conduct:
>
> (1) The offenses involved the same victim, or victims of the same type or from the same group.
>
> (2) The offenses were committed by the offender in the offender's same employment, or capacity, or relationship to another.
>
> (3) The offenses were committed as part of the same transaction or chain of events, or in furtherance of the same purpose or objective.
>
> (4) The offenses were committed in furtherance of the same conspiracy.
>
> (5) The offenses involved the same or a similar modus operandi.
>
> (6) The offenses were committed along the offender's line of travel in this state, regardless of the offender's point of origin or destination.

{¶62} In this case, the offenses were committed as part of the same transaction or chain of events, in furtherance of the same purpose: Dame Cisse obtaining employment with JPMC. We find all of the offenses were properly venued in Delaware County as part of a course of criminal conduct. See, *State v. Jewell*, 5th Dist. Delaware No. 01CAA03006, 2002-Ohio-226.

{¶63} Appellant further argues there is no evidence Jaga knew of Dame's scheme of identity fraud, but we disagree. Jaga admittedly went to Polaris Parkway for the background check; he claimed it was "weird" because he never applied for a job with JPMC, but he went nevertheless. The jury was free to believe him or not. The weight of the evidence and the credibility of the witnesses are determined by the trier of fact. *State v. Yarbrough*, 95 Ohio St.3d 227, 231, 2002-Ohio-2126, 767 N.E.2d 216. The jury also had the evidence of the paychecks payable to "Ndiaga" signed over to Dame and the fact that the brothers lived together for months while this scheme went on despite Jaga's claims of ignorance. Dame was also able to access Jaga's driver's license and other identifying paperwork, although both claimed Jaga did not give him permission to do so.

{¶64} In short, we are unable to find, upon reviewing the entire record, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be overturned and a new trial ordered.

{¶65} Appellant's two convictions for identity theft are supported by sufficient evidence and are not against the manifest weight of the evidence. Appellant's third and fourth assignments of error are overruled.

## CONCLUSION

{¶66} For the foregoing reasons, each of appellant's four assignments of error is overruled and the judgment of the Delaware County Court of Common Pleas is affirmed.

By: Delaney, J. and

Gwin, P.J.

Baldwin, J., concur.

_____
HON. PATRICIA A. DELANEY

_____
HON. W. SCOTT GWIN

_____
HON. CRAIG R. BALDWIN